# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| ALICIA CARR, § | |
| § | |
| Plaintiff § | |
| § | |
| v. § | Civil Action No. 3:10-CV-1474-BH |
| § | |
| MICHAEL J. ASTRUE, § | |
| Commissioner of Social Security, § | |
| § | |
| Defendant. § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of transfer dated September 30, 2010, this case has been reassigned for the conduct of all further proceedings. Before the Court are *Plaintiff, Alicia Carr's, Motion for Summary Judgment*, filed January 25, 2011, and *Defendant's Motion for Summary Judgment*, filed February 24, 2011. Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED**, Defendant's motion is **DENIED**, and the case is **REMANDED** to the Commissioner for reconsideration consistent with this opinion.

## I. BACKGROUND[1]

### A. Procedural History

Plaintiff Alicia Marie Carr ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act. On October 31, 2008, Plaintiff applied for SSI benefits, alleging disability since January 1, 2001, due to bipolar disorder and depression.

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "R." It is limited to information relevant to the disposition of the first issue only.

(R. at 94, 174, 222.) Her application was denied initially and upon reconsideration. (R. at 93-94.) She timely requested a hearing before an Administrative Law Judge ("ALJ"), and personally appeared and testified at a hearing held on March 9, 2010. (R. at 22-23, 109.) On March 26, 2010, the ALJ issued a decision finding Plaintiff not disabled. (R. at 7-21.) The Appeals Council denied her request for review and the ALJ's decision became the final decision of the Commissioner. (R. at 2-6.) Plaintiff timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

**B.     Factual History**

    **1.     Age, Education, and Work Experience**

Plaintiff was born on April 10, 1969, was thirty-one years old on her alleged onset date, and was forty years old at the time of the hearing before the ALJ. (R. at 174.) She has a high school education (R. at 16, 30), and has had "a series of short term work attempts primarily in the food worker industry" that do not rise to the substantial gainful activity level (R. at 86-87).

    **2.     Medical Evidence**

On October 27, 2008, Plaintiff was referred to Dallas Metrocare Services ("Metrocare") for crisis intervention by the suicide hotline. (R. at 305-06.) Plaintiff reported that she was feeling hopeless and helpless with no energy and low motivation, had been irritable and restless, had been crying daily, had not been sleeping, felt trapped, could not focus or concentrate, and got upset over anything. (R. at 306, 308.) The attending registered nurse ("RN") noted "significant stressors" such as marital conflict, isolation from family, few friends, and few activities. (R. at 306.) The RN also noted that Plaintiff had intrusive suicidal ideations but denied any intent or plan. (*Id.*) With respect to her psychiatric history, she noted that Plaintiff had been treated for depression since 2000 by her primary care physician and had been diagnosed with bipolar disorder in 2002, but she did not take

medication due to fear of addiction. (*Id.*) She noted that Plaintiff had a history of polysubstance abuse but had been clean for eighteen months, and she instructed her to take her medications as prescribed and to follow up at the Lakes Regional Mental Health Mental Retardation Center ("MHMR") in Greenville. (R. at 306, 310.)

Plaintiff was seen at the MHMR on October 31, 2008. She reported that she could not stand her husband for more than a few hours a week, had severe outbursts of anger and headaches, sometimes needed to sit in a dark room to deal with the pain, and could not get along with the public. (R. at 313, 317.) A licenced professional counselor ("LPC") noted her diagnosis of bipolar disorder and assigned her an Adult Texas Recommended Assessment Guidelines ("TRAG") score of four on a five point scale with respect to her functional limitations. (R. at 313.) A TRAG score of four indicated significant functional impairment and was based on one or more of the following during the past ninety days: evidence of significant difficulties in interactions with others that may include impulsive or abusive behaviors; evidence of significant withdrawal and avoidance of almost all social interactions; below baseline appearance and hygiene consistently for most of the time; significant disturbance in activities such as sleep, eating, and/or sexual interest as evidenced by such things as weight change or fatigue that threaten physical or mental well being; and significant inability to fulfill responsibilities in school, work, parenting, or other obligations to the point of complete neglect on a frequent basis or for an extended period of time. *See* Tex. Dep't of State Health Servs, *User's Manual for the Adult Tex. Recommended Assessment Guidelines*. The LPC also assigned Plaintiff a global assessment of functioning ("GAF") score of forty. (R. at 313.)[2]

---

[2] GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001). A GAF score of forty indicates major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV–TR") p. 32 (4th ed. 1994).

On November 12, 2008, Plaintiff saw another RN at MHMR. (R. at 320.) Plaintiff stated that she was experiencing depression rated at eight on a ten-point scale, was not sleeping well, and had nightmares related to her thirteen year old daughter. (*Id.*) She reported that after her head injury as a teenager, she had been in the mental health system for at least twenty years and had been on many medications in the past, including Citalopram, Depakote, Seroquel, Risperdal, and Lithium. (*Id.*) She stated that before going to Metrocare, she had been off her medication for six months because of moving and getting established in another MHMR system. (*Id.*) She reported that she was a recovering addict but had been clean for a year. (*Id.*) The RN explained to her that she would not be able to see the doctor for three months and that if she needed to see a doctor for medication change, she should follow up at Metrocare. (*Id.*)

On November 14, 2008, Plaintiff saw an RN again at MHMR. (R. at 325-32.) She reported that her thirteen-year-old daughter had run away, and that she was experiencing horrible sleep, high anxiety, irritability, and racing thoughts. (R. at 325.) The RN observed that she was appropriately dressed and had increased motor activity, appropriate affect, excited range, intact recent memory, fair insight and judgment, and normal intellect. (R. at 327-28.) The RN noted, however, that her speech was pressured, her interview behavior was sensitive, and she was unable to concentrate. (R. at 327.) She identified Plaintiff's strengths as her motivation for treatment and her family support and involvement. (R. at 328.) A psychiatric evaluation of Plaintiff was completed the same day, and on a scale of zero to ten, she was assigned a six on her depression and mania, an eight on her anxiety and insomnia, a three on her irritability and energy level, a four on her agitation, and a five on her mood lability. (R. at 330-31.) She had no homicidal and suicidal ideations (R. at 331), and her diagnosis again was bipolar disorder (R. at 334). On December 1, 2008, Plaintiff saw an RN again and was started on some new medication. (R. at 323-24.)

On December 3, 2008, a qualified mental health professional ("QMHP") at MHMR noted on a Brief Bipolar Disorder Symptom Scale that Plaintiff had moderately severe symptoms of hostility, depressed mood, emotional withdrawal, and blunted affect; moderate symptoms of elevated mood and excitement; and mild symptoms of motor hyperactivity. (R. at 337.) He assigned Plaintiff a TRAG score of four with respect to her functional impairment. (*Id.*) That same day, an LPC noted her diagnosis as bipolar disorder, most recent episode mixed, severe with psychotic features. (R. at 339-41.) That same month, Plaintiff saw an RN for a medication check at MHMR; she rated her depression as a five and her anxiety as a seven on a ten-point scale. (R. at 345.) The RN observed that Plaintiff had poor eye contact and was irritable, and she reinforced her previous instructions regarding the crisis hotline and medication compliance. (*Id.*)

A psychological evaluation of Plaintiff was conducted on January 1, 2009. (R. at 330.) Plaintiff was noted to be doing a little better, and was assigned a six on mania, a five on depression, a three on irritability, a four on mood lability, a five on agitation, a five on anxiety, a five on level of interest, a three on energy level, and a five on insomnia on a ten-point scale. (R. at 330-31.) She was noted as having nightmares that made her scream in her sleep, but she was not suicidal or homicida, and had a "partial" response to her medication. (R. at 348.) The diagnosis again was bipolar disorder, most recent episode mixed, severe with psychotic features. (R. at 351.)

On February 18, 2009, Ronald W. Anderson, Ph.D., evaluated Plaintiff at the request of the Disability Determination Services. (R. at 354.) Plaintiff appeared polite and co-operative with fairly good personal grooming and in no acute physical pain or distress. (*Id.*) She alleged that she had bipolar disorder and depression, described her emotional health as a roller coaster ride, and stated that she was suicidal at times. (*Id.*) Dr. Anderson described Plaintiff's thought process as "concrete" and fairly well organized and noted that she had no organized delusions or hallucinations

or homicidal thoughts, but she had some thoughts of suicide and was rather obsessive or compulsive about washing her hands a lot. (R. at 356.) Plaintiff reported that she was depressed and ranked her depression as an eight on a ten-point scale. (*Id.*) She complained of some anxiety and occasional panic attacks, and vocalized her concern about her fourteen-year-old daughter who had run away from a foster home to live with her older nineteen-year-old sister. (*Id.*) She reported that none of her eight children lived with her. (*Id.*)

Dr. Anderson noted that Plaintiff was capable of a full range of affect, and during the exam, "her affect varied from being depressed and a little labile to being a little hyper and vigilant." (R. at 356.) Her recent and remote memory were good, her concentration skills appeared good, and her judgment and insight appeared fair. (R. at 357.) Dr. Anderson diagnosed her with bipolar II disorder, most recent episode depressed; anxiety disorder, not otherwise specified; and polysubstance dependence in remission. (*Id.*) He assigned her a GAF score of fifty to sixty.[3] (*Id.*)

On March 3, 2009, Charles Lankford, Ph.D., a state agency consultant, found Plaintiff's medically determinable impairments to be bipolar disorder and anxiety disorder. (R. at 359, 362, 364.) He noted that Plaintiff had mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no extended episodes of decompensation. (R. at 369.) He also completed a mental residual functional capacity ("RFC") assessment noting that Plaintiff was moderately limited in her ability to understand and remember detailed instruction; carry out detailed instructions; perform activities with a schedule; maintain regular attendance; be punctual within customary tolerances;

---

[3] A GAF score of fifty indicates "serious symptoms" such as suicidal ideation, severe obsessional rituals, frequent shoplifting; or any serious impairment in social, occupational, or school functioning such as no friends and an inability to keep a job. *See* DSM-IV-TR, p. 34 (4th ed. 2000). A GAF rating of fifty-one to sixty indicates a "moderate" impairment in social, occupational, or school functioning. *Id.*

work in coordination with or proximity to others without being distracted by them; complete a normal work-day and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without interruptions from psychologically based symptoms; perform at a consistent pace and without unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (R. at 373-74.) Dr. Lankford concluded that Plaintiff could understand, remember, and carry out detailed but not complex instruction; make decisions; attend and concentrate for extended periods; accept instructions; and respond appropriately to changes in routine work setting. (R. at 375.)

### 3. Hearing Testimony

On March 9, 2010, Plaintiff, two medical experts, and a vocational expert ("VE") testified at a hearing before the ALJ. (R. at 22-92.) Plaintiff was represented by an attorney. (R. at 22.)

#### *a. Plaintiff's Testimony*

Plaintiff testified that she was forty years old, was five feet nine inches tall, weighed about 250 pounds, and lived with her husband and his brother. (R. at 27-28.) She had eight children who were either going to school or college or living with her relatives in Utah. (R. at 29-30.)

Plaintiff testified that as a teenager, she suffered a head injury in a car accident. (R. at 90.) As a result of the accident, her head was opened twice to let the pressure out, a coma was induced, rocks were taken out of her head, and she was in the hospital for about three weeks. (*Id.*) After the accident, she received mental health intervention for about twenty years and had been involved with MHMR ever since. (R. at 90-91.) She first started seeing a psychiatrist for her mental problems in

2000 at the suggestion of her primary care physician; at the time she had constant crying spells, lost her temper and yelled about everything, was irritable, could not get hold of her emotions, and was frazzled and fragile. (R. at 59, 62.) The psychiatrist told her that she had bipolar disorder and prescribed medication for it. (R. at 61.) Even though she was compliant with her medication, she did not like the fact that it made her feel like a "zombie." (R. at 61-62.) She stopped going to her psychiatrist eventually because her insurance ran out. (R. at 63.)

She testified that she had started going to the Lakes Regional MHMR a couple of years ago. (R. at 63.) She went there for a group session every Friday, to see a nurse about once a month, and to see a doctor about once a year. (*Id.*) The professionals at MHMR had diagnosed her with bipolar disorder. (R. at 64.) Because of her bipolar disorder, she experienced "roller coaster, up and down mood swings," had trouble concentrating, and had trouble getting things done. (*Id.*) She had suicidal thoughts every couple of months and had called the suicide hotline but had never attempted suicide. (R. at 66.)

Plaintiff also testified with respect to her alcohol and drug abuse history. She had started drinking as a teenager and was a heavy drinker by age twenty. (R. at 69.) Since October of 2008, she drank beer only once or twice "to an extremity." (R. at 70.) She had been caught drinking twice the previous year and had been arrested once for public intoxication the year before. (R. at 70-71.) She had started using drugs as a teenager as well. (R. at 71.) She had been sober for five years following a treatment program but relapsed again. (R. at 72.) She had used meth, coke, and heroin, but had used marijuana the most. (*Id.*) She used a little bit of marijuana once a week and sometimes more than once when her headaches were really bad. (R. at 73.) She had received rehabilitation treatment for drugs twice, once in 2002 and again in 2005. (R. at 74.) Her heavy use of drugs had

stopped four years ago, and she had last used drugs two months earlier. (R. at 72-73.)

Plaintiff testified that most of the jobs she had held were union type jobs, so it was easier for her to work and receive help in her situation. (R. at 91.) She had held only short-term temporary positions since her alleged onset date. (R. at 35.) She was fired from all her jobs (R. at 67), usually for losing her "cool" and "say[ing] something to the wrong person or in the wrong way" (R. at 36). For example, if "somebody was being an idiot," she would tell them to stop being an idiot. (R. at 36.) She would also unknowingly step on people's toes. (R. at 67.)

### b. Medical Expert Testimony

Dr. Smith, a medical expert, testified with respect to Plaintiff's mental health history. (R. at 76-86.) Dr. Smith testified that Plaintiff had been diagnosed with bipolar disorder and an anxiety disorder. (R. at 77.) He summarized her mental health history as follows: Plaintiff came into care under crisis in October of 2008, was treated with some medication in the next three months or so, started showing some improvement in January of 2009, and in February of 2009, had symptoms in the moderate range that were less severe than when she first sought medical treatment. (R. at 80.) He also performed a psychiatric technique analysis and opined that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no extended episodes of decompensation. (R. at 81-82.) As for Plaintiff's limitations in the workplace, he opined that Plaintiff would be limited to non-complex tasks and incidental interactions with co-workers, supervisors, and the general public. (R. at 82.)

### c. Vocational Expert Testimony

The VE testified that Plaintiff "had a series of short term work attempts primarily in the food

worker industry," for example, as a bus person, dining-room attendant, waitress, and delivery driver. (R. at 86-87.) None of the jobs rose to the substantial gainful activity level, however. (R. at 87.)

The VE opined that Plaintiff could not perform any of her prior work with the following functional limitations: lift ten pounds regularly and twenty pounds occasionally; stand six hours of an eight-hour workday; sit six hours of an eight-hour workday with the opportunity to change positions for one to two minutes at thirty to sixty-minute intervals; no ropes, ladders, or scaffolds; occasionally perform other postural activities; non-complex tasks; and incidental contact with co-workers, supervisors, and the public. (*Id.*) He opined, however, that a hypothetical individual with Plaintiff's age, education, work experience, and the same vocational profile could perform other work existing in significant numbers in the regional and national economy, such as the jobs of a housekeeper in a hotel setting, and a laundry folder and a press operator in a commercial laundry setting. (R. at 88-89.) He further opined that the jobs were non-complex and involved simple one or two step tasks. (R. at 88.) He stated that all competitive employment would be precluded if the hypothetical individual had to take a half-hour scheduled pain break as needed. (R. at 89.)

**C.     ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on March 26, 2010. (R. at 10-17.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 31, 2008, the application date. (R. at 12, ¶ 1.) At step two, he found that Plaintiff had the following severe combination of impairments: "bipolar disorder (depression), anxiety, obesity (BMI 40), and a substance abuse history." (*Id.*, ¶ 2.) At step three, he found that Plaintiff did not have an impairment or a combination of impairments that met or equaled a listed impairment. (*Id.*, ¶ 3.) In his RFC assessment, the ALJ found that Plaintiff had the capacity to lift

up to twenty pounds at a time; lift and carry ten pounds frequently; stand six hours of an eight-hour workday; sit six hours of an eight-hour workday; change positions to stretch one to two minutes at thirty to sixty minute intervals; no ropes, ladders or scaffolds; occasional postural positions; no complex instructions; and only incidental contact with the public, co-workers and supervisors ." (R. at 13, ¶ 4.) He found that Plaintiff was unable to perform her past relevant work, but given her age, education, and RFC, could perform other jobs existing in significant numbers in the national economy. (R. at 16, ¶¶ 5-9.) He concluded that Plaintiff had not been disabled since the date of her application. (R. at 17, ¶ 10.)

## II. ANALYSIS

### A. Legal Standards

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson*

*v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.*

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). The Commissioner utilizes a sequential five-step inquiry to determine whether an adult is disabled and entitled to benefits under the Social Security Act:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3. Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse the Commissioner's decision for an award of benefits. (Pl. Br. at 10.) When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, 2009 WL 3029772, at * 10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id.* at * 11 (citation omitted). Inconsistencies and unresolved issues

in the record preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005). The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

**B.      Issues for Review**

Plaintiff presents the following issues for review:

1. Whether the ALJ's failure to consider whether Plaintiff was capable not only of obtaining, but also maintaining employment for a significant period of time warrants remand.

2. Does the ALJ's finding that Plaintiff's RFC is limited by the inability to perform complex work properly accommodate Plaintiff's acknowledged moderate limitation in the domain of concentration, persistence, and pace.

(Pl. Br. at 2.)

**C.      Issue One: Maintaining Employment**

Plaintiff first argues that the ALJ erred by failing to consider whether she was capable of maintaining employment for a significant period of time. (Pl. Br. at 3.)

A finding that a social security claimant is able to engage in substantial gainful activity requires "more than a mere determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time." *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986); *see also Leidler v. Sullivan*, 885 F.2d 291, 292-93 (5th Cir. 1981). This requirement extends to cases involving mental as well as physical impairments. *Watson v. Barnhart*, 288 F.3d 212, 217-218 (5th Cir. 2002). The requirement is not universal, however; the ALJ is not required in every case to make specific and distinct findings that the claimant can maintain employment over a sustained period. *Frank v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005). An RFC determination

- 14 -

itself encompasses the necessary finding unless the claimant's ailment, by its nature, "waxes and wanes in its manifestation of disabling symptoms." *See id*; *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005). A specific finding is required if there is "evidence that [the] claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC." *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003). Allegations that an impairment causes good days and bad days do not by themselves require an explicit finding on maintaining employment. *See Perez*, 415 F.3d at 465.

In this case, the ALJ recognized that an individual's RFC is her "ability to do physical and mental work activities on a sustained basis" and cited 20 C.F.R § 404.1545 and social security ruling 96-8p, both of which make clear that an RFC is a measure of a claimant's capacity to perform work "on a regular and continuing basis." (R. at 11.) He also found that Plaintiff was "capable of making a successful adjustment to work that exists in significant numbers in the national economy." (R. at 16-17.) Under these circumstances, the ALJ was not required to make a specific finding on Plaintiff's ability to maintain employment absent evidence that her ability to maintain employment would be compromised despite her ability to perform employment as an initial matter, or an indication that he did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC. *See Dunbar*, 330 F.3d at 672.

The evidence before the ALJ showed that Plaintiff had consistently been diagnosed with bipolar disorder, an impairment that by its very nature fluctuates between manic and depressive states with periods of apparent stability. *See Cline v. Astrue*, 577 F.Supp. 2d 835, 850 (N.D. Tex. 2008) (citing American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*,

p. 386 (Text Revision 4th ed. 2000)). The evidence also showed that Plaintiff had been in the mental health system for about twenty years following her head injury as a teenager; had been on several medications for her mental health issues; had been diagnosed with bipolar disorder since 2002; had a work history that consisted of "a series of short term work attempts" that did not rise to the substantial gainful activity level; and had been fired from all her jobs usually for losing her "cool" or "saying the wrong thing in the wrong way." (R. at 36, 67, 86-87, 306, 320.)

Moreover, professionals at MHMR, assigned Plaintiff a TRAG score of four twice, indicating significant functional impairment, and a GAF score of forty indicating major impairment in several areas such as work, family relations, judgment, thinking, and mood. (R. at 313, 337.) The consultative examiner likewise assigned her a GAF score of fifty to sixty, with fifty indicating a serious impairment in social, occupational, or school functioning such as an inability to keep a job, and fifty-one to sixty indicating moderate impairment in those areas. (R. at 357.) Even though the Commissioner has declined to endorse the GAF scale for use in the Social Security and SSI disability programs,and has indicated that GAF scores have no direct correlation to the severity requirements of the mental disorders listings, the scores can be indicative of difficulty in social and occupational functioning and can support mental health limitations independent of physical limitations. *See* 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000); *Brown v. Astrue*, 2010 WL 5135924, at *7 (S.D. Ohio 2010). In light of this evidence, the ALJ erred by failing to make the specific determination required by *Singletary*. *See Leidler*, 895 F.2d at 293-94; *Frank*, 326 F.3d at 619.

Generally, appeals from administrative agencies of a procedural error will not lead to a vacated judgment "unless the substantial rights of a party have been affected." *Anderson v. Sullivan*,

887 F.2d 630, 634 (5th Cir. 1989) (per curiam) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam)). However, a failure to apply the *Singletary* standard is a legal error, not a procedural error. The Fifth Circuit has left the lower courts no discretion to determine whether such an error was harmless. Rather, the court mandated that when the Commissioner "has relied on erroneous legal standards in assessing the evidence, he must reconsider that denial." *Moore*, 895 F.2d at 1070 (quoting *Leidler*, 885 F.2d at 294).

Given the ALJ's legal error, the case is remanded to the Commissioner for reconsideration under *Singletary*. Since remand is required on this issue, the Court does not consider the remaining issue for review.

### III. CONCLUSION

Plaintiff's motion for summary judgment is **GRANTED**, Defendant's motion for summary judgment is **DENIED**, and the case is **REMANDED** to the Commissioner for reconsideration consistent with this opinion.

**SO ORDERED,** on this 21st day of April, 2011.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE